**UNITED STATES of America ex rel. MODERN ELECTRIC, INC., Appellant/Cross–Appellee,**

v.

**IDEAL ELECTRONIC SECURITY CO., INC., Appellee/Cross–Appellant.**

**Nos. 95–7119, 95–7121.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1996.

Decided April 19, 1996.

Michael P. Darrow, Annapolis, MD, argued the cause and filed the briefs, for appellant/cross-appellee.

Curtis R. Smothers, Washington, DC, argued the cause, for appellee/cross-appellant. With him on the briefs, was John W. Karr.

Before: WALD, WILLIAMS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this dispute between a government contractor and its subcontractor, we review the district court's determination that fifty-two purchase orders and three oral requests for services were not contracts. Because the district court apparently assumed, contrary to District of Columbia law, that purchase orders cannot be contracts, we reverse and remand for reconsideration. We also set aside the district court's award to the subcontractor on an unjust enrichment claim added to the subcontractor's complaint after trial.

## I.

Pursuant to Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (1994), Ideal Electronic Security Co., Inc.—the defendant, appellee, and cross-appellant—obtained a three-year contract to replace PCB-laced electrical transformers at the Walter Reed Medical Centers in Washington, D.C. and Forest Glen, Maryland. In preparing its bid for the Walter Reed contract, Ideal cooperated with Modern Electric, Inc.—the plaintiff, appellant, and cross-appellee—which had expertise working with PCB-laced transformers. With the understanding that Modern would perform much of the work under the contract if Ideal won the bid, Ideal based its bid on Modern's price estimates for contract line items.

After Ideal won the contract in July 1991, Modern performed several tasks under the contract, apparently expecting that the two companies would enter into a written subcontract. They finally signed a written subcontract on November 26, 1991. The subcontract included a termination date of April 2, 1992—only four months later—even though both parties expected that the Walter Reed project would take much longer to finish. The written subcontract required Ideal to "use standard purchase order forms for all orders" and provided that Ideal would pay Modern for each invoiced amount after Ideal received payment from the Government. The subcontract also provided that Ideal would supply 25% of the labor for the entire project and that during any given period Ideal would provide at least 20% of the labor. Accordingly, the subcontract required Modern to deduct from all its invoices wages incurred by Ideal personnel, with the wages determined by the wage rates set in the prime contract between the Government and Ideal. Modern was also to deduct from the invoices a 20.7% labor tax on these wages.

The typical course of dealings between Ideal and Modern pursuant to the subcontract was as follows. Ideal sent Modern purchase orders identifying specific tasks that needed to be done pursuant to delivery orders that the Government sent to Ideal under the prime contract. Ideal's purchase orders, usually signed by an Ideal representative, included quantity and price terms. Ideal based its prices on the line item prices in the prime contract. After receiving a purchase order, Modern performed the work, sending Ideal an invoice or a series of invoices; the charges on Modern's invoices typically corresponded to the prices Ideal had listed in its purchase orders. Pursuant to the terms of the subcontract, Ideal was entitled to a labor credit representing wages for its personnel working on each project. Ideal was thus usually not liable for the full amounts listed in Modern's invoices, and Modern apparently granted Ideal labor credits as a matter of course.

Although the terms of the written subcontract expired on April 2, 1992, Modern continued performing work pursuant to purchase orders for approximately another year. Their course of dealings, at least for a while, followed the same pattern as under the written subcontract. At a certain point, however, disagreements arose about the timing of Ideal's payments. Modern charged that the

payments were late, but Ideal took the position that it did not have to pay Modern until the Government paid Ideal, as the expired subcontract had provided. In January 1993, Ideal agreed to make payment on invoices within forty-five days. In exchange, Modern made concessions regarding wage rates and labor credits. The January agreement also required Ideal to notify Modern of any dispute as to the amount charged in an invoice within three days of receiving that invoice.

According to Modern, Ideal continued to make late payments. On March 26, 1993, Modern charged that Ideal was in breach of the January agreement regarding the timing of payments. In April, after discussions with Ideal, Modern agreed that Ideal could have five days upon receipt of each invoice to give notice of disputed charges. From April to June of 1993, the companies exchanged angry letters and faxes concerning late payments and damage that Ideal alleged Modern had caused to sidewalks at the Walter Reed Medical Center. In September 1993, Modern declared that it would perform no more work for Ideal.

Modern filed suit for breach of contract in the United States District Court for the District of Maryland. The suit was transferred to the United States District Court for the District of Columbia. The complaint alleged that after the expiration of the written subcontract, Modern and Ideal had an oral contract requiring payment on invoices within forty-five days. At trial, Modern modified its theory, arguing that each purchase order was itself a contract and also that the companies had entered into three oral agreements for Modern to perform certain services without purchase orders. Modern claimed damages totaling $227,722.27. Modern also amended its complaint to add a quantum meruit claim.

In response to Modern's claims, Ideal argued that the parties had intended that the written subcontract, providing that Ideal would pay Modern when the Government paid Ideal, would remain in effect for the full period of the prime contract, despite the subcontract's stated termination date of April 2, 1992. Ideal further argued that, were

Modern to prevail on any of its claims, Ideal would be entitled to numerous setoffs against those claims. According to Ideal, these setoffs, totaling $272,603.15, were to compensate for labor credits; for remediation; for overcharges; for work not performed; for work not authorized by purchase order; for invoices paid in full; and for work by Modern that the Government refused to accept.

Ruling from the bench following trial without a jury, the district court concluded that the written subcontract expired as its terms provided on April 2, 1992 and that the individual purchase orders issued by Ideal and Ideal's oral requests for work were not contracts and thus created no contractual liability. *See* Trial Tr. at 647–49, *United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.* (D.D.C. Mar. 9, 1995) (No. 94–385). The district court also ruled that, because there was no contract between the companies, their January 1993 letter agreement about payment terms, wage rates, and labor credits was neither a new contract nor a modification of an existing contract. *See id.* at 649–50. The district court next rejected Modern's quantum meruit claim. Acknowledging that Modern had shown that it had rendered valuable services for and bestowed a substantial benefit on Ideal, that Ideal had accepted the services, and that Modern had expected payment, *see id.* at 650–52, the district court nevertheless concluded that Modern "ha[d] not sustained its burden of proof" as to the value of the services it rendered so "as to require Ideal to make larger payments than it ha[d] already made," *id.* at 652.

The district court then ruled that in three instances Ideal had taken unwarranted discounts from Modern's invoices. Conceding that "the record is not totally clear," the district judge explained that he "[thought he] heard" that Ideal asserted a credit for $12,039.97 that Modern had already credited it for; that Ideal took a credit for $88,664.30 because the Government had not paid it for certain work done by Modern; and that, due to the Government's failure to pay Ideal, Ideal refused to pay Modern $4,799.92 for emergency work required because of a lightning strike. *Id.* at 653–55. The district court announced that if Modern moved to

amend its complaint to add an unjust enrichment claim for these three amounts, the court would enter judgment against Ideal for the total of these amounts, $105,504.19. *See id.* at 655. Modern responded with an oral motion to amend its complaint, and the district court later entered judgment against Ideal on Modern's unjust enrichment claim. *See United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, No. 94–385, slip op. at 2 (D.D.C. Apr. 13, 1995) (mem.).

Modern appeals the district court's ruling that Ideal's purchase orders and oral requests for work were not contracts. Ideal cross-appeals, charging that the district court improperly permitted Modern to amend its complaint to add an unjust enrichment claim and arguing that the district court erred in finding Ideal liable on that claim.

## II.

■ We first consider the district court's ruling that the purchase orders and oral requests pursuant to which Modern performed services for Ideal did not give rise to contractual obligations. In reviewing this ruling, we accept the district court's factual findings unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a). Our review of the district court's conclusions of law is *de novo. See Salve Regina College v. Russell*, 499 U.S. 225, 231–33, 111 S.Ct. 1217, 1220–22, 113 L.Ed.2d 190 (1991).

■ In its ruling, the district court stated:

> Modern's testimony is that it thought of and treated each new purchase order as a new contract.
>
> . . . .
>
> Modern doesn't have any legal support for the proposition that it was entitled to continue to accept purchase orders, do the work, bill whatever its price was and then sue for any shortfall in the payments.
>
> . . . .
>
> Doing work by purchase order is possible. A lot of work was done by purchase order . . . and that's fine. That establishes a nice contractual course of dealing, but each purchase order is not a contract.

> And doing work by purchase order does not solve the problem of the contractual basis for suing on a purchase order.
>
> So I find that Modern did the work it did and submitted invoices and Ideal made the payments it made. But that after April 2, 1992, there was no contract between the parties.

Trial Tr. at 648–49. As we read these statements—particularly the suggestion that "the contractual basis for suing on a purchase order" poses a "problem"—the district court apparently assumed that, as a matter of law, a purchase order cannot give rise to contractual liability. Under District of Columbia law, however, a purchase order can be a contract. *See, e.g., Electronic Instruments for Research, Inc. v. Georgetown Univ.*, 222 A.2d 708, 709 (D.C.1966). Even when a purchase order is signed by only one party, the purchase order may stand as an offer with performance of its terms constituting acceptance. *Cf. Opton, Inc. v. FDIC*, 647 A.2d 1126, 1134 n. 6 (D.C.1994) (explaining that in a unilateral contract, performance constitutes acceptance of an offer). This principle is well-recognized, even outside District of Columbia common law. Under the Federal Acquisition Regulations System, for example, contracts include, "[i]n addition to bilateral instruments, . . . orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance." 48 C.F.R. § 2.101 (1994). The procurement provisions of the District of Columbia Code similarly define the term "[c]ontract" to include purchase orders. D.C.CODE ANN. § 1–1181.7(13)(D) (1992 Repl.).

Although we thus agree with Modern that, as a matter of law, purchase orders can be contracts, we decline to decide whether the fifty-two purchase orders and three alleged oral agreements in this case actually gave rise to contractual obligations. Because the district court made few factual findings regarding these separate alleged agreements, we think that the more prudent course is to reverse the district court's ruling that no contract existed between the parties and to remand for reconsideration of Modern's contractual claims. On remand, the district

court will need to make specific findings regarding each of the fifty-five alleged agreements, bearing in mind that the expiration of the original written subcontract between Ideal and Modern, standing alone, does not defeat Modern's claims that the individual purchase orders and alleged oral agreements were legally binding contracts. And, of course, not every misunderstanding of the parties constitutes a defense to a breach of contract claim under District of Columbia law. *See, e.g., Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 271–74 (D.C.1987) (adopting the position of the RESTATEMENT (SECOND) OF CONTRACTS §§ 153–54 (1981)). Finally, although we offer no conclusions as to whether the parties actually entered binding contracts, we understand Modern's position to be that, for many of the alleged contracts, Ideal's liability is based on prices listed in Ideal's purchase orders not, as the district court suggested, that Modern could "accept purchase orders, do the work, [and] bill whatever its price was." Trial Tr. at 649.

### III.

In its cross-appeal, Ideal challenges two district court rulings: the ruling allowing Modern, at the court's post-trial suggestion, to amend its complaint to include a claim for unjust enrichment; and the judgment in Modern's favor on this claim for $105,504.19. Pointing out that Modern never mentioned an unjust enrichment claim in its complaint or during the trial, Ideal argues that it never consented to the trial of unjust enrichment issues. Ideal claims that the ruling came as a complete surprise, noting that in allowing the amendment the district court relied on the very evidence that Ideal itself submitted to support its claim that it would be entitled to certain setoffs if judgment were entered against it. According to Ideal, the district court misconstrued three of its setoff claims as concessions that, although it had owed certain amounts for work Modern had done, it had deducted these amounts from its payments to Modern.

Rule 15(b) of the Federal Rules of Civil Procedure allows amendment of pleadings to conform to evidence actually presented at trial. Rule 15(b) makes consent of the parties—either express or implied—a condition for treating unpled issues as though they were raised in the pleadings. The rule states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, *even after judgment;* but failure so to amend does not affect the result of the trial of these issues.

Fed.R.Civ.P. 15(b) (emphasis added).

■ In reviewing a district court decision allowing or disallowing an amendment of the pleadings pursuant to Rule 15(b), we may reverse only if the district court abused its discretion. *See Brown v. Cooper Clinic, P.A.*, 734 F.2d 1298, 1301 (8th Cir.1984) (finding no abuse of discretion in district court's decision not to allow amendment of pleadings to include claim for unjust enrichment). Because of Rule 15(b)'s focus on the consent of the parties and because pleading under the Federal Rules is designed primarily to provide parties with notice of the opposing parties' claims, *see Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957), we focus here on whether events at trial should have put Ideal on notice that the issue of unjust enrichment was entering the case.

■ Finding three instances of unjust enrichment, the district court awarded judgment against Ideal for three amounts: $12,039.97; $88,664.30; and $4,799.92. For purposes of our Rule 15(b) analysis, we treat these as separate claims.

As to the $12,039.97 claim, the parties agree that Ideal paid this sum to third parties for certain testing and that Modern later credited Ideal for the same amount. Although the district court apparently concluded that Ideal later took yet another credit for $12,039.97, Ideal claims that it did no such thing, asserting instead that it simply argued that this amount should be deducted from

any judgment rendered against it in this litigation. Although we question the basis for Ideal's claimed setoff, we are puzzled as well by the district court's ruling allowing Modern to amend its complaint to add a claim for this amount to which only *Ideal* asserted a right. We asked the parties at oral argument to submit record citations supporting the award. We can find no basis in their submissions or elsewhere in the record, however, for the district court's conclusion that Ideal took an unwarranted credit for $12,039.97 in paying amounts due on other invoices. Although the district court cited two exhibits, we have examined them and fail to see how they support the district court's finding. Furthermore, Modern does not even seem to have claimed a right to this sum during trial on its contract and quantum meruit claims. In the absence of evidence suggesting that Ideal took an unwarranted credit for the amount for which Modern had already credited it, Ideal could not have been on notice that the issue of its liability on an unjust enrichment theory for this sum of money was entering the case. Because neither the district court nor the parties identified any evidence in the record supporting the district court's decision to allow Modern to add this claim, we reverse this decision and vacate the portion of the judgment awarding Modern $12,039.97.

■ The district court also allowed an amendment adding a claim that Ideal was liable to Modern for $88,664.30 arising out of certain duct bank remediation work. Apparently because Ideal had paid for the work, Modern did not assert a right to this amount in its complaint or at trial. The district court nevertheless found that Ideal had deducted $88,664.30 from its payments to Modern because the Government had not paid Ideal. In finding Ideal liable for this amount, however, the district court cited no record evidence indicating that Ideal ever took such a credit. Nor have the parties pointed us to any such evidence in the record. Instead, they have referred us to exhibits showing merely that Ideal paid Modern $88,664.30 and later asserted at trial that, were it to be found liable to Modern, this amount should be deducted from any judgment against Ideal because the Government had not yet paid

Ideal. Absent some indication in the record that the issue of Ideal's liability for this $88,664.30 was ever raised even implicitly at trial, we cannot sustain the district court's allowance of an amendment under Rule 15(b) to include an unjust enrichment claim for this amount. We therefore vacate the portion of the judgment awarding Modern $88,664.30.

The unjust enrichment claim for $4,799.92 for emergency work arising out of a lightning strike stands in a different posture from the other two claims and poses a closer question. From the beginning of this lawsuit, Modern asserted a contractual right to this amount. Furthermore, in a trial exhibit listing and rebutting each of Modern's claims, Ideal included the claim for $4,799.92, explaining that, because the Government had not paid it for the work, it was not liable.

■ In considering whether the issue of unjust enrichment for this amount was tried by express or implied consent of the parties, we are mindful of the overlap between claims based on quantum meruit and claims based on unjust enrichment, for the district court had previously permitted Modern to amend its complaint to add a claim for quantum meruit recovery. Although the District of Columbia Court of Appeals uses the term "quantum meruit" to describe both forms of recovery, *see TVL Assocs. v. A & M Constr. Corp.*, 474 A.2d 156, 159 (D.C.1984), it distinguishes between these two causes of action, *see Providence Hospital v. Dorsey*, 634 A.2d 1216, 1219 n. 8 (D.C.1993); *see also Bloomgarden v. Coyer*, 479 F.2d 201, 208–12 (D.C.Cir.1973) (emphasizing the distinctions between these two theories of liability), and the parties do not quarrel with the district court's treatment of these as distinct theories of recovery. The first—quantum meruit— rests on a contract implied in fact, that is, a contract inferred from the conduct of the parties. This cause of action has four requirements: "1) valuable services rendered by the plaintiff; 2) for the person from whom recovery is sought; 3) which services were accepted and enjoyed by that person; and 4) under circumstances which reasonably notified the person that the plaintiff, in performing such services, expected to be paid."

*Providence Hosp.*, 634 A.2d at 1218 n. 8 (citing *Brown v. Brown*, 524 A.2d 1184, 1190 (D.C.1987)). Unjust enrichment, the second theory of recovery, rests on a contract implied in law, that is, on the principle of quasi-contract. This second form of recovery is possible in the absence of any contract, actual or implied in fact. *See Bloomgarden*, 479 F.2d at 210. Recovery on an unjust enrichment theory requires a showing that "a person retains a benefit ... which in justice and equity belongs to another." *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C.1992). As the District of Columbia Court of Appeals has explained, "the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit, not on whether the person or persons who bestowed the benefit had any duty to do so." *Id.* at 56. Recovery is thus available "even though no intention of the parties to bind themselves contractually can be discerned." *Bloomgarden*, 479 F.2d at 210.

Because of the similarities between these causes of action, evidence to support recovery under a contract implied in fact will often be of the same sort necessary to prove an unjust enrichment claim. A plaintiff seeking recovery under a quasi-contract theory of unjust enrichment, however, must make one showing not required for recovery under a contract implied in fact: that it would be unjust for the recipient of a benefit to retain that benefit. Ideal's explanation in its trial exhibit that it had no obligation to pay Modern for the lightning strike work as long as the Government did not pay Ideal can be viewed as raising just this issue—the fairness of Ideal's retention of the value of Modern's services.

The evidence Ideal introduced that tends to raise this issue, however, was also related to the contractual issues in this case. The relevance of such evidence to both pled and unpled claims poses potential problems under Rule 15(b). Because the rule is concerned

with notice, courts generally should not presume implied consent for Rule 15(b) purposes from the introduction of evidence arguably relevant to issues that are already raised by pled claims. By itself, the introduction of evidence relevant to both pled and unpled issues "cannot serve to give a party fair notice that new issues are entering the case," *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir.1987), nor does it "imply consent to trial of the unpled issues, absent some obvious attempt to raise them," *Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1089 (2d Cir.1986).

The close relationship between quantum meruit claims based on contracts implied in fact and quasi-contractual unjust enrichment claims thus cuts both ways in the Rule 15(b) analysis when only one of those claims is pled. On the one hand, a party may introduce evidence relevant to both claims without intending to consent to trial of an unpled claim; on the other hand, the prejudice to such a party from lack of notice may be slight, for the same evidence that the party would likely introduce to defend against the unpled claim may have already entered the case in the party's defense against the pled claim.

 Mindful that Ideal was throughout the litigation on notice that Modern was asserting Ideal's liability for $4,799.92 for lightning strike work that Modern performed at Ideal's oral request, we think that the district court did not abuse its discretion in allowing Modern to supplement its complaint with an unjust enrichment claim for this amount. Although we thus affirm the district court's decision to allow Modern to add this unjust enrichment claim for $4,799.92, the judgment awarding this amount to Modern is a different matter. Because a claim of unjust enrichment rests on quasi-contract and is available only in the absence of a contract, either actual or implied in fact, and because we have ruled in Part II above that

the district court should reconsider Ideal's contractual liability, if any, we vacate the portion of the judgment awarding Modern $4,799.92. On remand, the district court should consider this unjust enrichment claim only if it finds that Ideal is not contractually liable to Modern for this amount.

We therefore vacate in full the judgment against Ideal.

*So ordered.*